15-3389 from the Southern District of Iowa, Invarsity Christian Fellowship, USA et al. v. University of Iowa et al. Very good, Mr. Thompson. We're ready if you are. Thank you, Your Honor. Can you hear me okay? Absolutely, yes. Okay, thank you. May it please the Court, Counsel. Three years ago, almost to the day, Judge Rose in the Southern District of Iowa entered a preliminary injunction restoring business leaders in Christ, blink, as a registered student organization at the University of Iowa for 90 days. In doing so, Judge Rose found that the requirement that the university had that registered student organizations adopt and comply with a university human rights policy was facially constitutional, but the requirements were not consistently and equally applied to the RSOs, and that this selective enforcement meant that blink had a fair chance to succeed on the merits, and she entered the injunction. The Court's order three years ago expressly contemplated that the University of Iowa would begin making changes to the enforcement practices for their policy. This case today that you hear arises from the University of Iowa's good faith efforts to comply with that order. We propose that these are precisely the type of official acts that should be shielded by qualified immunity, and that's why we are here today. And to be clear, that's why we are here today only on the issue of qualified immunity. We have not appealed the merits of this case. We remain committed to working through this and trying to sort through the RSO issues in compliance with the law, but the qualified immunity question is obviously very important to the university and to the state of Iowa, and we believe that in the university case, Judge Rose got it wrong. Let me ask you about that. Certainly, for purposes of our qualified immunity analysis, how the issue is framed is of great importance and may even be case dispositive. Starting right off in the summary of the argument, you described the issue as whether the University of Iowa should decline to enforce the terms of its non-discrimination policy to resolve a conflict between civil rights laws and the beliefs of a student organization. My question is this. The facts that were before the district court and this court don't seem to line up with that characterization, so are you telling this court that the policy is being applied evenly to all RSOs and not according to viewpoint? Yes. But let me go back and answer your question about how it's characterized. I mean, I think the question of qualified immunity in this case is frankly best viewed through the lens of Judge Rose's order in Blank where she substantively determined that we were entitled to qualified immunity on the same essential facts, the same framework, the same policies. And how she characterized it is she focused on the clearly established prong of the test, prong two, and said that she can't find where it is clearly established about the application of applying a viewpoint neutral discrimination policy that's facially viewpoint neutral to restrict leadership selection of religious groups. I mean, that's how she characterized it. It's the same issue we have here. I mean, the factual, to get to your point, there is a factual. Counsel, that might be true if you had a policy that was viewpoint neutral and it was being applied in a non-discriminatory manner, but that doesn't seem to be the facts that are before us here. Correct. But again, I mean, I think your question presumes, really I think frankly begs the question, Your Honor, that if we simply answer the question of whether this is an RSO and it's a limited public forum and it was not fully accurately applied, it was applied inconsistently, that that gets us to the answer. And I don't think it does, because I think the limited public forum analysis that you're really asking me about has never really been applied directly to a factual scenario like this that dealt with a non-discrimination plan and that then the application was inconsistent and how that works and how you evaluate that. And frankly, what that means in the context of a non-discrimination policy in the context of a limited public forum. In other words, by definition, that policy, when you apply it, could very well have disparate impact, if you will, on different types of organizations. And so I'd like to focus you on the factual basis of this case, because I think you're right, the facts matter. But I think the way it's been characterized as being targeted at viewpoints is not correct. We still are trying to work through the issues that deal with inconsistent enforcement. Well, counsel, I'm a little confused here. I mean, that was the district court's finding, correct, that there was a viewpoint discrimination at the university. And what I heard you say initially is, and I may have misunderstood you, is that you're not appealing that. You're only appealing the issue of whether it's clearly established. Now, am I misunderstanding your argument? No, I don't think so. But I think that the nuances, again, under qualified immunity, what I'm talking about, I think that the high-level issue of you can't engage in direct viewpoint discrimination in a limited public forum is well established. And we've, I think, conceded that throughout. But here we have, if you look at the factual record in this case, what happened is— Counsel, just following up on that, let's suppose you had a viewpoint-neutral policy which was applied in a way that was blatantly racial discriminatory. Are you saying that the clearly established doctrine does not permit that to be— There wouldn't be qualified immunity then, would there? If you're saying it was intentionally racially motivated, no, absolutely there would not be qualified immunity. Forget subjective intent. If it was objectively clearly racially discriminatory, you know, there was a complaint against a fraternity that had not admitted to African Americans for 60 years, and the university said, despite its policy, so what? Certain administrators, whoever was in charge of enforcing the policy. And your argument, as I'm understanding it, is nothing's clearly established in this world as long as the policy on its face is viewpoint-neutral. No, Your Honor, I'm not saying that. And I agree with— Now we have a finding of non-viewpoint neutrality, as Judge Kolb has pointed out. How does your argument save the day? I think the argument saves the day if you look through the characterization, and I understand the legal framework that you're talking about, Your Honor, but what the university did in response to the preliminary injunction is important here, and how we got here in this case that arose in the context of the other case. And what they did in response to the order is identified 513 RSOs that were covered by the Office of Student Life. Well, starting with the religious organizations, isn't that what the record shows? Well, the record shows that they had to start somewhere, and there's no doubt. And if you look at the preliminary injunction— But they selected the religious organizations to start with. I mean, that's correct, right? It is, because in the blank case, if you look at the preliminary injunction order and the record in the blank case, a lot of the evidence that Judge Rose pointed to that she was concerned about was that there were other religious organizations who were not being asked to apply the same standard. And so— Counsel, let me follow up on that just for a moment, if I may. One thing that I'm curious about in your brief, it repeatedly makes reference to the religious beliefs of intervarsity, and I'm confused as to what the religious beliefs of any RSO have to do with the university's policy or this case. They don't, really. But what they do have to do is it's the religious beliefs— And again, if you look through all the cases that we've talked about in regard of this, whether it's Martinez, the discussion of how uniquely— Appley's own brief talks about how religious belief is intrinsically intertwined with status and conduct. And so there— Well, just to clarify what I'm talking about here, in the summary of your argument, you say that this policy that the university has is an attempt to resolve a conflict between civil rights laws and the beliefs of the student organization. What beliefs are you talking about? Well, I think the practical issue here is that there are certain beliefs that end up leading to action that could violate the human rights policy. In other words, looking at—not challenging the belief themselves, the things. Like the Healy case, the difference between the view and the action or the conduct. And that there are certain beliefs that expressed in a constitution for an RSO says, because of what we believe, we will not let a student that doesn't believe that way either be a member or be a leader. What happens is that belief leads to conduct. That's true for non-religious groups as well, isn't it? Absolutely. A group that identifies with a certain ethnicity or racial background and limits leadership also runs into conflict with your policy. Absolutely. Absolutely, Your Honor. But the Blank case and this case were about religious organizations and about the leadership issue, primarily. And so when we went through and looked at 500 organizations, you know, 356 of them weren't in compliance. And every one of the 356 got a notice that says you've got to come into compliance. And of the ones that got notices, 39 did not. And they weren't all religious organizations. One of them was intervarsity. And all 39 of the organizations that did not align their constitutions with the human rights policy were decertified. And so there's a difference, I believe, between the viewpoint discrimination cases like Gerlach, like Goff, and the other ones where there is this individual organization singled out because of their beliefs. Here it becomes categorical because of the conflict. If you would refresh my recollection, weren't there exemptions? Didn't the university grant exemptions to certain non-religious organizations? Well, there are. Again, as literally while this case was developing, as they were trying to do the review, they began with a category of cases of organizations, all the organizations under Student Life. Other categorically different organizations like the Greek world and some of the sports enterprises were going to be reviewed and reviewed by other people. There was an attempt to create a Title IX exception, which many universities do that deal with residential halls and things. And so all of that is going on literally while this case is going on. And the university officials are trying to juggle that. I mean, the Iowa legislature during this case, you know, in our state, the Iowa Civil Rights Act literally has a specific section that applies to educational institutions. And during the case, after the blank order, the legislature created a new section of the Iowa code that required the leadership exception that now has been the focus of this case. So, I mean, what the university officials have been facing is this moving target of how do you align the desire to have a human rights policy with a limited public forum set up. And no court has ever actually answered that question. Counsel, Judge Logan, again, all that being true, I don't doubt the good faith of an effort, whether the effort was in good policy or not, is not before us. But I can't get around the blatantly discriminatory treatment of inter-varsity versus love works by the same people. Well, I think, go back to my answer just a minute ago, your honor, is that it's not about the beliefs, it's whether those beliefs, evidence, or expressly show an intention to disallow students or as members or as leaders. And if love works' statement of faith says, here's what we believe, but we will accept anybody as a member or a leader, then they don't violate the policy. That's not the facts, is it? They don't accept anybody as a leader. They don't accept anybody who won't sign on for their core belief. That's what I understand the record shows. I think the record is unclear about that. Then we go forward without qualified immunity, in my view. I mean, I... Qualified immunity may need to be deferred. It doesn't have to be decided now. If we need a better fact record on something that appears as discriminatory as that, then you've appealed too soon. I'm losing you, I'm afraid. Your honor, you broke up. I didn't hear anything. But I think you said we could defer qualified immunity. Well, the court can defer qualified immunity if the record is unclear whether what appears to be a discriminatory application of the leadership rule between two competing, if you will, religious groups. That's not viewpoint neutrality if it's proved, and therefore it does not get qualified immunity if it's proved. Qualified immunity sometimes can't be applied until the end of trial. Why isn't that the answer here? I think it may be, your honor. I'm also, Sam, I'm running out of time. I'd like to hold a few minutes to reply to Appley's arguments. But I don't disagree with your character. I think that the fundamental issue that we have here, your honor, is this isn't a simple limited public forum issue where there's a direct viewpoint discriminatory act against an individual that was targeted because of religion. That the because of here is it's because of the human rights policy, not the belief. The belief comes into the play because it's the belief that connects up and leads to the conduct and the actions that the human rights policy would condemn. Thank you. I'll reserve the balance of my time if you if you can, if you can hear me. Yeah. Am I still not coming through? I can hear you. Yeah, it's it's messy. It could be my connection. I am both the video and. Yeah, well, you're you're coming through fine to me. So that if you can. Well, well, if you've got a technical person who could maybe clear up your audio. I will mute my mic and let. Mr. Blumberg, go ahead. Thank you, your honor. May it please the court. I represent the inner varsity appellees. This is a case of deliberate express religious viewpoint discrimination and defendants don't really argue otherwise. Instead, they argued the law against religious viewpoint discrimination wasn't quite clear enough and that they were just doing the best they could. I need to interrupt here, but in the point case, the district court granted qualified immunity. And in this case, it denied qualified immunity and the only intervening legal authority was the district court's own order in blank. Can that be right? I mean, can a district court clearly establish law for the purposes of qualified immunity in a previous case? Your honor, we don't we don't lean on that position. That's not our position here. Our position is the law was clearly established under garlic, Rosenberger and gone cases of that nature. Nature. We think that the district court's decision made it go beyond the pale for what the for what the defendants did here. But so depending on how blank the blank appeal comes out, and I was on that panel, depending on how that comes out, that arguably dictates the result in this case. Or do you think there are facts in this case that make it distinguishable? Your honor, I think that if this court rules in blanks favor, then then that will make it very hard to reach any other result here. If the court rules against blink, though, we think that there are still reasons why this court should rule in a varsity's favor. We think that the the injunctions are examples of that. We think that no reasonable official can read those injunctions. And the six pages of analysis detailing the well-established case law and Healy Widmar, Rosenberger, Gaunt and Gurley. All which ruled that public universities may not discriminate against speech on the basis of its viewpoint. We think that those that not just that injunction from January 2018, but again, the injunction from June 2018, both of which said selective enforcement is viewpoint discrimination and that violates clearly established law. We think that that makes it impossible for a reasonable public official to arrive at the result here. And that's why the district court said, I told you not to do X. You did double X. I think that's ludicrous. And on these facts, your honor, the discrimination here is also much more express. And I think that goes to a couple of corrections, a fact that I need to make for my friend on the other side. First, to judge Logan's question, it is not at all in dispute that love works. It received preferential treatment that it was allowed to discriminate based on religious leadership. That's a inner varsity appendix. Twenty two. Thirty nine. Paragraph. Thirty two. Also at paragraph two. Thirteen. And it's also at paragraph two. Seventy nine on inner varsity appendix. Twenty five. Eleven. In each of those instances, it shows the university admitting as a matter of binding fact before the district court. The love works was allowed to select its leaders based on its religious beliefs. Intervarsity was not. And my friend on the other side also says that intervarsities religious beliefs weren't the issue here. It was not because of intervarsity of religious beliefs. And I think this goes to Judge Gross's questions right at the beginning about the different ways you can show this viewpoint discrimination through selective enforcement and also through directly targeting the religious belief as such. The facts on this case, the undisputed facts on this case before this court, which were not appealed, not contested before this court, show that it was, in fact, a religious viewpoint and only the religious viewpoint that was a basis for the university's discrimination. So at inner varsity at twenty ninety five. This is the the statement that the university makes to intervarsity for why it is going to deregister it. It says a restriction on leadership rated related to religious beliefs is contradictory to the policy. Now, the policy expressly permits exclusion of individuals who do not subscribe to the goals and beliefs of the student organization. That's an intervarsity at twenty two thirty six and also at page three sixty seven. So the policy permits groups to organize around their beliefs and exclude people who don't share their beliefs. The distinction was here. And again, this is expressed on the record that the university said other types of beliefs are permissible. Basis for exclusion. Religious beliefs are not intervarsity of at twenty five. Fourteen paragraphs. Three hundred to three hundred and three make this very, very clear. Where the university's 30B6 witness testified that political and ideological groups exclude based on their beliefs and religious groups may not exclude based on their beliefs. In fact, we asked the question, you know, if the if a political ideological group had a belief on poverty and it was rooted in their political and ideological beliefs, would that be a permissible basis for excluding a member or a leader? And the testimony is, yes, that would. And then we switched and we asked, OK, so what about if the exact same belief was rooted in religion, religious group that said you have to hold the exact same belief regarding poverty alleviation? But it was rooted in religion. Is that permissible? And the answer was no. That violates the policy. The only reason on the facts before this, before this court admitted by the below is that the registration was for religious leadership requirement. And that violates clearly established law, not just under the free speech clause, but also under the free exercise clause where the government is targeting religious beliefs as such. It is exceedingly clear that that violates clearly established law under the the free speech case law. I think the it's very, very clear. You look at the Rosenberger case. It says it is presumptively unconstitutional and a blatant and egregious violation of the First Amendment to target religious speech. And the Garlick case in the gun case all confirm that is a clearly established right. The public university cannot discriminate against a registered student organization on the basis of its viewpoint. In fact, the gun case in 1988 said this is one of the fundamental premises of American law. A public body doesn't have to choose to create a forum like this. But once it does, it cannot discriminate among recipients on the basis of their ideology. And the Martinez case, which is one of very few that my friend on the other side rely on, affirmed those decisions. This court, the very first sentence, the Martinez case, is that a series of decisions from this court have emphasized that the First Amendment generally precludes public universities from denying student organizations access to school sponsored forums because of the group's viewpoints. And this court and other courts have found again and again and again that selective targeting of religious viewpoints or or on disfavored viewpoints is unconstitutional. The girl at the council doesn't go all the way back to 1963 in the Sherbert case. Yes, Your Honor. I think the 1963 case that makes it very clear under the free exercise line of analysis that you can't discriminate against religious beliefs as such, which is what the university was doing here. And we think that the the the university raises the context of a nondiscrimination policy. So what we're we're enforcing a nondiscrimination policy. And I think Judge Loken put the identified the problem with that. The issue here is that there's very, very clear selective enforcement, which is making the nondiscrimination policy really more of a background issue. It's not the primary issue. The primary issue is that the university chose to target religious beliefs as such and did it while exempting dozens and dozens of other policies from the exact or other student organizations and its own programs from the exact same policy. So if you look at the exemption for Greek groups, that exemption didn't exist on the face of the policy they're enforcing against intervarsity until they chose to enforce it against intervarsity. Then they wrote in an exemption for Greek groups to memorialize the practice that have been in place for 150 years to allow them to discriminate, not just on the basis of leadership, but for membership for thousands of positions on campus on the basis of sex. The university also, as we discussed earlier, allowed exemptions for groups that are called that created safe spaces. These were discretionary exemption that have made it at its own choice when he wanted to. And that was the love works exemption. That was also the House of Lord exemption, which are both reflected in a intervarsity appendix, 25, 16. And in those cases, the university was permitted or permitting these groups discriminate on the basis of religion, on the basis of sexual orientation, on the basis of race. And meanwhile, they're turning around to intervarsity. Small group was only asking that for leadership positions be reserved for the people who actually believe in the God they're praying to. And the university said they wouldn't permit them to do that. In fact, the student group asked, they said, well, can we at least strongly encourage our leaders to believe in our God? And the university said, no, the university considered that they took time with it and they rejected it. And Judge Cobas, I think this goes back to one of the points that you were asking about as well. How does this case potentially distinguishable from blank? Again, we think the law is very clear that should come out the same way as this case. But the university had plenty of time to arrive at the decision that it did. This is not a standard qualified immunity case. This is not a police officer facing a split second decision, a life or death exigent circumstance. Nor is it a case where the government official didn't have any clear guidance. These these officials had written time and time again, 1999, 2004, 2008, in writing, repeatedly affirming exactly the the the case law that they eventually buy it. And in fact, they wrote in writing to two students on campus and told them that if they did the thing that they're doing now to interverse, that that would subject them to personal liability. So there's no question that these these officials had plenty of time to process the situation. Comes the right answer, in fact, had previously come to the right answer. And there was no need to rush to what the district court rightly characterized as an extreme sanction of deregistration. There was no harm to the university's interest here. Intervarsity had been an award winning member of the campus community for twenty five years. And the university didn't even attempt to identify any harm from continuing to accommodate intervarsities, religious beliefs, just as it was willing to do for other groups. It didn't even attempt to research the issue, even though it knew that other major universities, such as Iowa State Universities, did create leadership accommodations. It refused to look at those questions and it just deregistered intervarsity and wouldn't even allow them to encourage their leaders to share their faith. And then it wasn't it wasn't a matter of like the university didn't quite know how to deal with the situation, because we can look at how it treated the Greek groups, groups like Love Works and the political and ideological groups. When the university wanted to accommodate a group, it created a way to do that. And they accommodates the biggest, the largest groups on campus, groups that had the universities express support. In fact, the university told students that they should try to join these groups, the Greek groups that have the selected membership policies, because those are the best and most important groups to be a part of for their career prospects and their academic career. So the university was touting access to a group that excluded thousands of individuals from accessing it. And meanwhile, told intervarsity that they couldn't even ask for members to believe in their God. So the the the university deliberately. Made the decision to discriminate against intervarsity and and carefully and appropriately accommodated other types of other types of group on groups on campus. You know, the other point that I want to make here is just to go through the free exercise case law, because we think that that also clearly establishes the type of discrimination that occurred here is is well beyond well beyond the pale. Two reasons for that, your honor. First, it's very clearly established that that discrimination against religious student groups is is is a violation of the exercise clause. Trinity Lutheran said that is clear and unremarkable and a basic principle. The free exercise clause protects religious observers against unequal treatment. And it relied on cases like me and McDaniel versus Haiti and Wisconsin versus Yoder to reach that result. And just last year, the in the Espinoza case, the court reaffirmed that point and said that those principles have long guided this court in decades of precedent. That have, quote, repeatedly confirmed that religious discrimination as a basis for disqualifying an applicant to a public benefit is unconstitutional. In fact, it was so clear that it was, in fact, it was indisputably clear in the recent Roman Catholic Diocese of Brooklyn case where the Supreme Court found that the the all writs act standard, the indisputably clear all writs act standard was met. And so they allowed the court to deny any instance of religious discrimination being perpetrated by Governor Cuomo. And that that standard has been applied in the university setting the district court in this in this circuit in the Raider case and the Sixth Circuit in the ward case. And actually, the word case is particularly helpful because it brings together both the free exercise and free speech line of analysis explains how religious discrimination violates both and reaches the result that qualified immunity is is not available when university officials engage in this kind of religious discrimination. And it's the discrimination was doubly clear here because it was also not just discrimination against religious views, as we saw for the preferential treatment of Greek groups over religious groups, but also discrimination among religious groups. As we see, the preferential treatment of love works as opposed to intervarsity and the sick awareness club and the Imam Mahdi Muslim group. You know, the second reason why the law is exceedingly clear on the issue of under the free exercise clause goes to the the rules against discriminating on the basis of belief and leadership. So the Trinity Lutheran case relying on the Kumi McDaniel said that a law targeting religious belief as such is never permissible, never permissible without even having to go to the strict scrutiny qualified immunity analysis. That's because those religious belief is absolutely beyond the reach of the government. And here the universe, the university has admitted that is targeting religious belief as such. In fact, the university said the harm of exclusion is much greater. And the harm of exclusion is trying to avoid is much greater by the Greek groups. It's just as it's the exact same harm by the ideological and political groups. But the university is willing to permit it in those other instances and not willing to permit it in the instance of religious belief based selection. Your Honor, the other issue, and this goes to the one thing that we think the district court was wrong on below, is that is exceedingly clear that the government can't control internal religious leadership. The district court said that that if unless you had both an establishment clause and a free exercise clause showing of government interference in a leadership select and leadership selection, that that the protection that the free exercise clause provides for religious leadership just kind of falls away entirely. And if I could cancel, let me ask you a question about that. I do understand the argument that if you're the university's limiting the pool of eligible leaders, it is effectively becoming involved in their selection. But I'd like you to address another distinction. That is, I believe the argument was that that that holding had never been made in a university setting. It's usually in a ecclesiastical setting. Does that make any difference under the Constitution? No, Your Honor, the religion clauses apply just as much in the university setting as they apply in any other setting. I think the point here isn't that the application of religion clauses necessarily clearly established at the same level at the Rosenberger line of cases and the Trinity Lutheran line of cases are. It's just that the the university's discrimination here and the targeting that they engage in against religious belief is so flagrant that it implicates even this protection against religious discrimination. So the one what the the religion clause line of analysis does is it protects government from interfering in those internal religious affairs. And so I think the key point in the key error of the district court made there, as it said, unless you can show both an establishment clause violation of free exercise clause violation. There are no independent constitutional protections for religious leadership selection, and this court directly rejected that line of argument in the sharing case where it said establishment clauses. One thing free exercise clause. Another. They come together and provide complimentary protections, but they stand on their own two feet. If a university had an all comers policy, could that potentially violate the religion clauses under your under your argument? Yes, your honor. But that's not an issue that this court has to address here, because I just did. Yeah. You mean you mean Martinez was wrong? No, your honor, because in Martinez, that issue wasn't raised. That was a membership and leadership decision, and it came two years before the Supreme Court decided Hosanna Tabor so that there was no issue on that. And even in Martinez, the court was recognizing that leadership presents some kind of unique consideration. I'm struggling, then, with how the breadth of your argument. First, you talk about leadership. Then you say their remedy was to get into the membership. Now, if you're just arguing leadership rules, period. Then maybe I understand your argument, but as broadly stated in answer to other questions, it seems to me, combined with your answer to Judge Gullis, you're telling us Martinez was wrong. No, your honor. Which you might believe, but we can't hold. Correct. I don't think that's before this court, and I think Martinez is only helpful for intervarsity in this case. I mean, Martinez reaffirms the longstanding line of free exercise analysis against religious viewpoint discrimination. The point isn't that Martinez was wrong. The point is that when the university engaged in this kind of targeted discrimination against religious beliefs as such and religious leadership, it treads into very, very dangerous waters. And so, again, it takes us well beyond what a reasonable official would have thought would have been permissible. Your honor, I think the in conclusion. Counsel, just one follow up. Would you argue that that law is clearly established or are you saying it's I think what I heard you say is it's less clearly established than what you were discussing earlier. Is that is that fair? Yeah. For purposes of the of the clearly established analysis under step two of qualified immunity. We think that the much clearer and easier place for this court to go is to decide it under the free speech and free exercise line of analysis. Our point is just that the district court went awry when she said the free exercise clause has no protections for for religious leadership selection. And that's that's contrary to what the sharing court held. So we think this case kind of begins and ends at the religious viewpoint discrimination. We think that it's clearly established that religious viewpoint discrimination is presumptively unconstitutional, period. And the only exception is where the government can pass strict scrutiny, which defendants didn't even attempt to do here and couldn't do in any event. And so for those reasons, along with the ones in our brief, we asked this court affirm the district court's denial of qualified immunity. Thank you. I haven't looked at your complaint. What what relief is sought on the merits of the case? Is it limited to the narrow issue you claim is all we have to worry about or is your relief much broader? The relief we ask for, your honor, is an injunction against the religious discrimination. The university was engaging in along with with damages. Thank you. Thank you. Thank you. Let's see for our council. Thank you, your honor. Just a couple of things to follow up. I think that the exchange that you just had with counsel on the free exercise cases illustrates a little bit of what I've been trying to talk about, which is, you know, the uncertainty is disagreement with Judge Rose's conclusions. And the discussion, for example, of Trinity and and Hosanna table or extending that to leadership exceptions for a resident registered student organizations, which obviously the court has not done in the context of qualified immunity. And I just asked the court to go back again to Judge Rose's determination in blank. That also was a selective enforcement case, albeit on a different, slightly different set of facts, different organizations. She did find selective enforcement. She did find exceptions and exclusions for other organizations in her factual record in blank. And she ruled that there were constitutional violations. But because in her own words, in order to figure that out, she had to fill in the blanks between Martinez and Reed and Walker. She found that the officials were entitled to qualified immunity on that record. The same legal theories, the same viewpoint, discriminatory application argument was the basis for the blank order. And when she found qualified immunity, we moved on. That's been appealed by by Mr. Bloomberg's counsel. In this case, as Judge Koba said, the only intervening authority since that determination by Judge Rose was her own her own preliminary injunction order. And that's what she refers to in her ruling on qualified immunity. And to your to your question, Your Honor, on that, that is not appropriate. I mean, a district court can't clearly establish anything and a preliminary injunction order typically wouldn't anyway. And I think that she was right on that issue of qualified immunity in blank on the same issues because qualified immunity deals with issues. And she was wrong in saying that her order trumped everything that she said in blank. Thank you for your time. I urge you to reverse the decision of the court. Thank you, counsel. The case is very well briefed and argued. Arguments been helpful for me and case raises interesting, important issues. We'll take it under advisement.